SMITH *v.* STATE

5193                                             402 S. W. 2d 412

Opinion delivered May 2, 1966

*Edward Trimble, Holt, Park & Holt,* for appellant.

*Bruce Bennett,* Attorney General, *Fletcher Jackson,* Assty. Atty. General, for appellee.

OSRO COBB, Justice. Appellant was convicted of the crime of rape and sentenced to life imprisonment in the penitentiary. On appeal from the conviction, appellant raises two points:

(1) Alleged insufficiency of the evidence to support the verdict; failure of the court to direct a verdict.

(2) Alleged error of trial court in permitting prosecuting attorney to question appellant with reference to a lie detector test.

*Point 1—The evidence.*

The victim in this crime is a grandmother. She and her four-year-old granddaughter were spending the night of July 24-25, 1965, in her apartment when the attack took place well after midnight. She testified:

That she was asleep when the intruder grabbed her by the neck, placed a hand over her mouth, and threatened, "If you make a sound I will kill you and the baby both;" that she was forced to another bed and there forcibly raped; that the rapist talked a great deal and that she remembered his voice. When the intruder appeared on the verge of a second act of rape, she begged him to leave, promising that he could return the following Wednesday night. During the commission of the crime the rapist had something over his face and hands. She later observed where the intruder had forcibly entered her apartment by cutting the screen and forcing his way through a window. When he left, she promptly locked herself in and asked the telephone operator for emergency help in contacting the police. The

police arrived in a matter of minutes. She was taken to the Baptist Hospital, where a pelvic examination was made about 5:30 a.m. by Dr. John E. Sorrels, Jr., an intern. When she got back home she considered herself reasonably calm, but when she glanced at the bed where the crime had been committed she screamed and became completely hysterical and had to be hospitalized for several days.

Dr. Sorrels testified that he made the pelvic examination of the victim revealing abrasions along the vaginal wall and the presence of male sperm.

Detective Sgt. J. C. Boles, who investigated the case, testified:

That anticipating the possible return of the rapist on Wednesday, the 28th, he arranged with the victim's daughter to be in her mother's bed as a decoy on that night, with the officer and a daughter-in-law of the victim present for protection, witnessing, and apprehension of the offender if he returned to the scene. All lights were turned out except the small wall socket light which was left on directly across the room from the window through which the previous entry had been gained. This light was some eight or ten feet from the window and shining directly upon the window. About 12:45 a.m. the sergeant observed a young colored man forcing his way through the window. The intruder's face was not covered, and was plainly visible during a considerable period of time as he stealthily made his entrance.

From said clear and extended observation, Sgt. Boles subsequently testified positively identifying appellant as the intruder. He was permitted to make entry into the room and to reach the bed where the decoy was simulating sleep when the sergeant identified himself and commanded a halt. The intruder dashed for the open window and the sergeant, in shooting to disable rather

than to kill the intruder, missed him and he escaped, leaving pieces of a flashlight and a cap and other materials which were immediately recovered. The victim of this crime was still in the hospital when the second episode took place.

A pick-up was broadcast covering the general description of the intruder. Appellant was in the police line-up, along with other suspects, on Friday morning, two days following the second episode, and the sergeant picked him out of the line-up and positively identified appellant as the man he had seen in the victim's home. The victim was still hospitalized and she did not have an opportunity to identify the offender from the line-up of several colored males with similar physical characteristics until the following Sunday morning, at which time the suspects were required to speak certain words, and from these spoken words the victim was able to recognize and identify the voice of appellant as that of her attacker. The cap recovered at the scene was found to fit the head of appellant in a test before the jury and other witnesses testified that appellant was known to wear a cap of such general description.

Appellant's mother and stepfather testified that appellant lived with them and that appellant was in their home during all of the nighttime of July 24-25 and on the night of July 28-29. Witness Humble further testified that appellant never did own, as far as he knew, a gray cap. Appellant testified that he was not at the scene of the crime on either occasion and other witnesses testified for appellant as to his good reputation. While the evidence was conflicting, we have concluded that the positive visual identification of appellant by Sgt. Boles, and the voice identification of appellant by the victim, together with the other proof as to the cap recovered at the scene and which was found to be similar to one worn by appellant and to actually fit appellant, constituted substantial evidence in support of the jury verdict.

If there is substantial evidence to support the jury

verdict, the case must be affirmed. As said in *Graves & Parham* v. *State*, 236 Ark. 936, 370 S. W. 2d 806 (1963):

"Upon the conflicting testimony the issues of fact were properly submitted to the jury. The appellants are in error in arguing that the State's failure to prove its case beyond a reasonable doubt entitles them to a reversal. The jury must be convinced of the accused's guilt beyond a reasonable doubt, but there is no requirement that the members of this court be similarly persuaded by the proof. Here the test is that of substantial evidence. If the verdict is supported by such proof we are not at liberty to disturb the conviction, even though we might think it to be against the weight of the evidence. *Fields* v. *State,* 154 Ark. 188, 241 S. W. 901."

*Rollie* v. *State,* 236 Ark. 853, 370 S. W. 2d 188 (1963), said:

"The appellant alleges five assignments of error in her motion for a new trial. We group the first three assignments inasmuch as they question the sufficiency of the evidence. On appeal all the evidence submitted at the trial must be viewed in the light most favorable to a jury verdict and if there is any substantial evidence to support the verdict it is our duty to sustain it. *Ashcraft* v. *State,* 208 Ark. 1089, 189 S. W. 2d 374; *Smith* v. *State,* 222 Ark. 650, 262 S. W. 2d 272."

There are numerous cases in accord with those quoted. *E. g., Rayburn* v. *State,* 240 Ark. 264, 398 S.W. 2d 909 (1966); *Higgins* v. *State,* 204 Ark. 233, 161 S. W. 2d 400 (1942); *Fields* v. *State,* 154 Ark. 188, 241 S. W. 901 (1922).

The victim identified appellant by his voice within a matter of days following the crime. She could not see her attacker in the darkness of the room. The attacker

made several statements to the victim and she had both the opportunity and reason to remember his voice, even under the trying circumstances.

In *Teer* v. *Commonwealth*, 307 Ky. 602, 212 S. W. 2d 106 (1948), the Kentucky court said:

"Furthermore, identity may be sufficiently established by the mere sound of a human voice."

Also see 22A *C. J. S., Criminal Law,* § 616 (b) (4) (1961); 23 *C. J. S., Criminal Law,* § 920 (1961).

We therefore conclude that appellant's contentions as to the insufficiency of the evidence and as to the denial of a directed verdict are without merit.

*Point 2—The reference in testimony to a lie detector test.*

When Sgt. Boles was undergoing cross-examination by appellant's counsel, he testified as follows:

"Q. Then why did you take him out to the State Police?

A. He kept on contending that he had not done anything unlawful and he offered to take a lie detector test.

Q. The truth of it is you all kept demanding that he take a lie detector test, didn't you?

A. No.

Q. And he told you he had nothing to hide and that he would take any test you wanted him to take, didn't he?

A. He told us that he wanted to take it. We did not insist because we didn't feel it was anything we should do because you can't introduce them in court, and so, therefore, we had nothing to gain as far as the City was concerned by giving him the test."

When appellant was on the stand, the state's attorney commented during cross-examination, "I believe your attorney mentioned that you took a lie detector test earlier in a conversation." Appellant's counsel objected and the parties retired to chambers, the state insisting that counsel for appellant had opened up the question as to the lie detector test and that permission should be granted to examine concerning same. The court made a ruling containing the following:

"Of course we all know clearly it is inadmissible normally under ordinary circumstances. It is just a question of whether he opened it up to where it would be admissible, or what we call invited error that he can't complain about. I am going to hold that that is the situation up to now."

The state's attorney thereafter questioned appellant and obtained responses as follows:

"Q. What were you asked on the lie detector test?

A. A lot of different questions.

Q. Tell me one of them.

A. Where was I at on the night of the 25th.

Q. What did you tell them?

A. At home.

Q. Were you asked if you had ever been shot at?

A. Yes.

Q. And what did you tell them?

A. No.

Q. Were you asked if you lost your cap anywhere?

A. I don't remember that.

Q. Did you lose your cap anywhere? -

A. No, I haven't.

The above questions and appellant's answers thereto did not serve in any way to incriminate appellant; if anything this evidence supported his contentions as to his innocence. Certainly the testimony of Sgt. Boles on cross-examination that appellant was insisting upon his innocence and had offered to take a lie detector test would not be evidence prejudicial to the accused, and would logically be considered as favorable to the accused. The error, if any, was therefore harmless and we find no merit in Point 2 urged by appellant. *Nathan* v. *State,* 235 Ark. 704, 361 S. W. 2d 637 (1962) involves circumstances very similar to those of the instant case and we quote therefrom:

"2. The record shows that appellant's attorney objected to a certain statement alleged to have been made to the jury by the prosecuting attorney in his opening statement. The alleged statement was a reference to the fact that appellant had been subjected to a lie-detector test. Over appellant's objection the trial court refused to declare a mistrial. If any possible error is indicated above we think it was later waived by appellant when he testified concerning the same incident."

In this case, counsel for appellant asked Sgt. Boles four different and separate questions concerning the lie detector test after Sgt. Boles had testified that the appellant had offered to take such a test.

Furthermore, the prosecution did not attempt at any time to introduce in evidence the results of the lie detector test.

It is clear from the record that appellant was never placed in the position of giving self-incriminating evidence by such a lie detector test; and it must therefore

follow that appellant's constitutional rights, both state and federal, were not breached by said testimony.

We therefore conclude that appellant's Point 2 is without merit.

Having found all of the contentions of appellant to be without merit, judgment of the trial court is affirmed.

AMSLER and BLAND, J. J., not participating.